**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **NEONODE SMARTPHONE LLC,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **-v-** | § | |
| | § | |
| **SAMSUNG ELECTRONICS CO., LTD.** | § | **6:20-CV-507-ADA** |
| **AND SAMSUNG ELECTRONICS** | § | |
| **AMERICA, INC.,** | § | |
| *Defendants.* | § | |
| | § | |

## <u>MEMORANDUM IN SUPPORT OF CLAIM CONSTRUCTION ORDER</u>

Before the Court are the parties' claim construction briefs. Plaintiff Neonode Smartphone LLC (hereinafter "Neonode") submitted its Complaint for Patent Infringement on June 8, 2020 (ECF No. 1). Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung") submitted the opening Markman Brief on April 14, 2023, and the Reply Markman Brief on June 9, 2023. (ECF Nos. 71, 84, respectively). Neonode submitted its response on May 19, 2023, and sur-reply brief on June 22, 2023 (ECF Nos. 81, 86, respectively). The Court held the Markman hearing on July 7, 2023. ECF No. 93. The Court provides this memorandum in support of its Claim Construction Order, and hereby incorporates-by-reference the claim construction hearing and transcript as well as the demonstrative slides presented by the parties during the hearing. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## TABLE OF CONTENTS

I.     BACKGROUND ................................................................................................ 3

II.    LEGAL PRINCIPLES .................................................................................... 3

     A.    Claim Construction ................................................................................ 3

     B.    Departing from the Ordinary Meaning of a Claim Term ...................... 6

     C.    Indefiniteness ......................................................................................... 7

III.    LEVEL OF ORDINARY SKILL IN THE ART ............................................. 7

IV.    CONSTRUCTION OF DISPUTED TERMS ................................................. 8

     A.    Term #1: "the representation consists of only one option for activating the function" ('879 Patent Claims 1) .......................................................... 11

           a.    The Parties' Positions ................................................................. 12
           b.    The Court's Analysis .................................................................. 17

     B.    Term #2: "gliding" (claims 1, 12) / "the object gliding along the touch sensitive area" (claim 1) / "gliding the object along the touch sensitive area" (claim 12). 19

           a.    The Parties' Positions ................................................................. 20
           b.    The Court's Analysis .................................................................. 22

V.    CONCLUSION ............................................................................................... 22

## I.   BACKGROUND

Neonode asserts that Samsung infringes claims of U.S. Patent No. 8,095,879 ("'879 patent" or the "Asserted Patent").

## II.   LEGAL PRINCIPLES

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed.

Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.*

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988));

*see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. Yet "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court has explained the role of extrinsic evidence in claim construction:

In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.    Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[1] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

---

[1] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g.*, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## C.  Indefiniteness

"[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application was filed. *Id.* at 911.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art ("POSITA"). *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The Federal Circuit has advised that the "[f]actors that may be considered in

determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

The parties do not dispute the qualifications of a POSITA, at least not at this stage in the case. Regarding the Asserted Patents, Samsung's expert, Dr. Andy Cockburn, opines that a POSITA would have "bachelor's degree in computer science or computer engineering, or the equivalent education, and at least two years of experience in user interface design and development. Additional years of experience could substitute for formal education, and vice versa." ECF No. 71-2 ¶ 35. Neonode does not rely on an expert for its claim construction briefing, nor does it dispute Samsung's level of skill. *See generally* ECF Nos. 81, 86.

Given that the parties do not dispute the qualifications of a POSITA at this time, and considering the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art is as defined by Samsung's expert, as discussed above for the Asserted Patents.

## IV.   CONSTRUCTION OF DISPUTED TERMS

The parties' dispute the meaning and scope of two terms or phrases in the Asserted Patent. Each dispute is addressed below.

The '879 patent relates generally to a user interface for a mobile handheld computer that comprises a touch sensitive area that allows a user to navigate among simultaneously running applications. '879 patent at 1:6–12. The annotated version of Figure 1 of the '879 patent

reproduced below illustrates an embodiment of this "user interface" with "a touch sensitive area 1, which is divided into a menu area 2 and a display area 3." *Id.* at 3:51–54. Menu area 2 is "adapted to present a representation of a first 21, a second 22 and a third 23 predefined function." *Id.* at 4:1–3.



In an embodiment, "FIG. 2 [below] shows that any one of these three functions 21, 22, 23 can be activated when the touch sensitive area 1 detects a movement of an object 4 [e.g., a finger] with its starting point A within the representation of a function on the menu area 2 and with a direction B from the menu area 2 to the display area 3." *Id.* at 4:7–11 (emphasis added), FIG. 2 (annotated).



The "object 4 can be a finger" or "a pen or other pointing device." *Id.* at 6:11–15.

In the embodiment described in the patent, the activated "first function 21 is a general application dependent function" (*see* FIG. 3), the second function 22 is a keyboard function (*see* FIG. 5), and the third function 23 is a task and file manager (*see* FIG. 6). *Id.* at 4:4–6. Using Figure 3 as an example, once first function 21 is activated by touching the representation of that function (the "+" icon in FIG. 1) with an object and moving the object away from the menu area into the display area, "then the display area 3 is adapted to display icons 211, 212, 213, 214, 215, 216 representing services or functions." *Id.* at 4:12–14. The user then selects a particular service or function by tapping on the icon, such as icon 213 in Figure 3. *Id.* at 4:34–35.



*Id.* at FIGs. 3, 5–6.

**A. Term #1: "the representation consists of only one option for activating the function"** ('879 Patent Claims 1)

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Final Construction |
|---|---|---|---|
| "the representation consists of only one option for activating the function" '879 Patent Claims 1. | Plain meaning | Indefinite | Indefinite |

Claim 1 of the '879 Patent, the sole independent claim, recites the claimed "user interface" comprises the following limitations:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>
>> a touch sensitive area in which a representation of a function is provided, wherein *the representation **consists of only one option for activating** the function and wherein the function is activated by a multi-step operation* comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) the object gliding along the touch sensitive area away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at cl. 1 (emphasis added).

The word "option" does not appear in the specification. *See id.* Rather, the specification merely says that the menu area "present[s] a representation" of a first, second and third function (*id.* at 2:5–7, 4:1–3)—without ever explaining what that representation consists of—and also says, "that any one of these three functions" "can be activated" when the touch sensitive area "detects a movement of an object" (*id.* at 2:10–14, 4:7–11)—without ever addressing the "only one option for activating the function" claim requirement.

### a.   The Parties' Positions

#### i.   *Samsung's Position*

Samsung contends that the "claim phrase is indefinite because a POSITA can read it to mean at least three conflicting things—and thus impose three different sets of requirements on accused products and prior art." ECF No. 71 at 5. According to Samsung, a POSITA would consider that phrase to have at least the following three possible meanings based on the claim language:

> (1) The representation represents a **single function** and there is only a **single option** to activate that function (e.g., only one specific input gesture will activate that function);
> (2) The representation may represent **multiple functions** but there is only a **single option** to activate one particular function (e.g., only one specific input gesture will activate one function, but a different input gesture activates a second function); and
> (3) The representation represents a **single function** and the claim allows **multiple options** to activate that function (e.g., any input gesture will activate that function).

*Id.* at 6. Indeed, Samsung created the following useful graphic to understand its position on the indefiniteness of this claim phrase (where "R" refers to representation, "f" refers to a function and "g" refers to a type of gesture):



*Id.*

Samsung explains why a POSITA would understand the claim language to support each of the above interpretations. *First*, Samsung argues the claim language supports meaning (1) because the claim recites "the function" (in the singular) and a POSITA could read that language as referring to a single function; and (b) a POSITA could read the "only one option" language to require that only one specific gesture may activate the one function. *Id.* at 7. *Second*, Samsung argues the claim language supports meaning (2) because: (a) a POSITA recognizes the antecedent basis of "the function" is "a function" and knows the use of the "a" could be read by a POSITA to permit one or more functions; and (b) a POSITA could read the "only one option" language to require that only one specific gesture may activate any given function. *Id. Third*, Samsung argues the claim language supports meaning (3) because a POSITA could read the "only one option" language as limiting "the representation" to one function (rather than limiting the number of activating gestures), in which case the claim recites a single function that any input gesture may activate. *Id.* Samsung therefore argues that the scope of claim 1 varies significantly depending on which of these three meanings applies, and no informed and confident choice is available among the contending definitions. *Id.*

Samsung further contends that the prosecution history confirms that the claims are

indefinite. *Id.* at 8. According to Samsung, applicant Neonode Inc. added the disputed claim limitation during prosecution to distinguish the claims from the prior art Hirshberg reference. *Id.* (citing ECF No. 71-3 at 2, 8–9). In attempting to distinguish Hirshberg, Neonode stated that "Hirshberg teaches a touch and glide operation only for keys that comprise several characters" and that, "[i]n distinction, the claimed invention uses a multi-step touch-and-glide operation for representations that consist of only one option for activating a function." *Id.* at 8–9. Samsung contends that this statement was made to distinguish the patent's claims from Hirshberg because although the claimed "representation" corresponds to only one function, each of the individual keys represented in Hirshberg could perform multiple functions (i.e., the entry of different characters depending on what gesture the user performed on the key). *Id.* at 9. Neonode Inc. similarly stated, with respect to the specification, that elements 22 and 23 (two of the three exemplary "representations" used in the specification at col. 4:1–6) each "consists of the one option" of opening their respective functions, again indicating that the "one option" claim language refers to the correspondence between a representation and its corresponding one function. *Id.*

In identifying support in the specification for its amendment, Neonode Inc. also told the PTO that "each representation . . . consists of only one option for activating its corresponding function." *Id.* In contrast to the above-discussed distinction—which focuses on the claimed representation corresponding to only one function—Samsung asserts that "this statement instead appears to also assert there is only one option ***(gesture)*** to activate a representation's corresponding function." *Id.* (emphasis added).

That's not all. Samsung also contends that Neonode increased uncertainty about this claim during the IPR proceeding initiated by Google on the '879 patent (IPR2021-01041) ("Google IPR"). *Id.* at 10. According to Samsung, during the Google IPR, Neonode initially explained that

the "representation presents the user with one option of what to activate," indicating that the "one

option" claim language relates to the correspondence between the representation and one function.

*Id.* Plaintiff also argued the "one-option limitation" should not be interpreted to "require that each

function associated with the representation of the function can be activated only by one gesture."

*Id.*

### ii.    *Neonode's Position*

Neonode responds that the claim is not indefinite because "the claim, the specification, the

prosecution file, and the IPR record collectively provide clear guidance as to the meaning of this

limitation: **the representation consists of only one option for activating one of the one or more**

**functions at any given time.**" ECF No. 81 at 5 (emphasis in original). To arrive at its construction,

Neonode divides some of the limitations in claim 1 of the '879 Patent into the three following

parts:



*Id.* at 6. According to Neonode, Limitation 1[a] recites a representation of a function; limitation

1[b] states a characteristic of the recited representation ("the representation consists of . . ."); and

limitation 1[c] recites how the function is activated. *Id.* Neonode therefore argues that "consists

of" limits "the representation." *Id.* Accordingly, Neonode explains that "consists of" neither limits

the number of functions that may be represented—addressed in limitation 1[a]—nor limits the number of ways to activate the represented function—addressed in limitation 1[c]. *Id.*

Because "the function" of limitation 1[b] relates back to a representation of "a function" in limitation 1[a], and the use of "a" carries a strong presumption that the claim covers "one or more" of the recited thing, Neonode contends that limitation 1[a] reads as "a touch sensitive area in which [one or more] representation[s] of [one or more] function[s] is[/are] provided." *Id.* (citing *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012)). And the use of "the" in limitation 1[b], referring to "the" represented function, connotes "the [one or more] function[s]." *Id.* Neonode thus argues that limitations 1[a] and 1[b], read together, inform a POSITA that, while a "representation" may represent more than one "function," it presents to the user only one option for activating one of those multiple functions at any given time.

In response to Samsung's contention that the specification fails to explain what the representations "consist of," Neonode asserts that the specification provides examples of the representations, which are depicted as graphical elements on the touch sensitive display. *Id.* at 7. And in response to Samsung's argument regarding the prosecution history, Neonode explains that although Samsung correctly notes that the "only one option" phrase was added during prosecution in order to overcome the Hirshberg reference, the applicant added the "only one option" language, which narrowed claim 1 to a combination that was not disclosed by Hirshberg: a representation that presents only one option for an activatable function at a given time ("representation [that] consists of only one option for activating a function"), which function is activatable by a touch and glide operation. *Id.* at 7–8. Neonode argues that the applicant explained that the specification discloses that each of representations 21–23 "consists of the one option of" activating a corresponding function. *Id.* at 8. Thus, the crux of Neonode's argument appears to boil down to

that the applicant allegedly argued to the PTO that the representation presents one option for activating a function at any given time (e.g., "displaying icons as appropriate for a currently active application."). *Id.* at 8–9.

### b.   The Court's Analysis

A claim is indefinite if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 134 S. Ct. at 2124. Notably, "a patent does not satisfy the definiteness requirement of § 112 merely because 'a court can ascribe some meaning to a patent's claims.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (quoting *Nautilus*, 134 S. Ct. at 2130). Rather, the claims "must provide objective boundaries for those of skill in the art." *Id.* Here, the Court finds, consistent with its oral ruling, claim 1 fails the definiteness requirement because the disputed claim language—which goes to the heart of the claimed "interface"—"'might mean several different things and no informed and confident choice is available among the contending definitions.'" *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) (quoting *Nautilus*, 134 S. Ct. at 2130 n.8).

As explained above, the word "option" does not appear in the specification (much less the broader phrase "only one option for activating the function"). Rather, the specification merely says that the menu area "'present[s] a representation' of a first, a second and a third function" ('879 patent at 2:5–7, 4:1–3)—without ever explaining what that representation consists of—and also says, "that any one of these three functions" "can be activated" when the touch sensitive area "detects a movement of an object" (*id.* at 2:10–14, 4:7–11)—without ever addressing the "only one option for activating the function" claim requirement.

Neonode contends that the plain meaning of this term is that the representation consists of

only one option for activating one of the one or more functions at any given time. According to Neonode, Samsung's indefiniteness argument relies on the erroneous assumption that the term "option" refers to the ***gesture*** required to activate the one or more functions. *See* ECF No. 81 at 9; ECF No. 86 at 2. Based on the prosecution history, Neonode instead contends that the "only one option" language refers to "a representation that ***<u>presents</u> only one option*** for an activatable function at a given time." ECF No. 81 at 8 (emphasis added).

The problem with Neonode's argument is that it is unclear to a POSITA whether the claim term "only one option" refers to either a ***gesture*** or ***function*** (as Samsung asserts) or to ***<u>presenting</u> the user with <u>an icon</u>*** (as Neonode appears to contend). Again, the specification does not define "option." Although the Plaintiff cites the prosecution history for the notion that "option" does not refer to a gesture, the Court finds that it is unclear to a POSITA what the claimed "option" is. *See* ECF No. 81 at 9; ECF No. 86 at 2. Indeed, Neonode confirms that it is contending that the claimed "option" refers not to "gestures" or "functions," but to what the patent describes as "icons." *See* ECF No. 81 at 8 ("The applicant's reliance on representation 21—corresponding to an 'application dependent' function that can cause the display to present different sets of icons to the user depending on context, such as whether a currently active application is running—***makes it clear*** that the representation ***presents one option*** for activating a function at any given time (***e.g., displaying icons*** as appropriate for a currently active application.") (emphasis added).

Critically, the patentee knew how to claim these graphical user interface elements—it called them "***icons***." *See, e.g.*, '879 Patent at cl. 2 ("wherein the function, when activated, causes the user interface to display ***icons*** representing different services or settings for a currently active application.") (emphasis added). By contrast, the patentee here used the term "***option***," and it is unclear to a POSITA (or this Court) whether "option" refers to a graphical user interface element,

a gesture to activate the function, or even the function itself. And as explained above in the summary of Samsung's argument, if the term "option" does indeed refer to gestures or functions (rather than "icons" or graphical user interface elements), then there are three equally competing interpretations of what this claim term means. And because there is "no informed and confident choice [that] is available among the[se] contending definitions"; the Court must find that the claim term is indefinite. *Media Rights*, 800 F.3d at 1371.

In sum, for at least the reasons identified above, the reasons stated in Samsung's briefing, and the reasons identified in the Court's oral ruling on the record, the Court finds that this term is indefinite.

**B. Term #2: "gliding"** (claims 1, 12) / **"the object gliding along the touch sensitive area"** (claim 1) / **"gliding the object along the touch sensitive area"** (claim 12)

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction | Court's Final Construction |
|---|---|---|---|
| **"gliding"** (claims 1, 12) / **"the object gliding along the touch sensitive area"** (claim 1) / **"gliding the object along the touch sensitive area"** (claim 12) | Plain meaning, not including a drag and drop operation | "gliding": Indefinite Remainder of claim term: No construction necessary; plain and ordinary meaning | Plain and ordinary meaning, not including dragging, flicking, or a drag and drop operation |

Claim 1 of the '879 Patent, the sole independent claim, recites the claimed "user interface" comprises the following limitations:

> 1. A non-transitory computer readable medium storing a computer program with computer program code, which, when read by a mobile handheld computer unit, allows the computer to present a user interface for the mobile handheld computer unit, the user interface comprising:
>> a touch sensitive area in which a representation of a function is provided, wherein the representation consists of only one option for activating the function and wherein the function

> is activated by a multi-step operation comprising (i) an object touching the touch sensitive area at a location where the representation is provided and then (ii) *the object **gliding** along the touch sensitive area* away from the touched location, wherein the representation of the function is not relocated or duplicated during the gliding.

'879 Patent at cl. 1 (emphasis added). The specification, however, never uses the words "glide," "flick" or "drag," or any variations thereof. Instead, the specification recites activating a function by detecting the "<u>movement</u> of an object" as shown in Figure 2. *See id.* at 4:7–9, 2:10–12 (emphasis added).

### a.   The Parties' Positions

Samsung contends this term is indefinite because Neonode's statements in the IPRs leave a POSITA unable to determine what does and what does not constitute "gliding." ECF No. 71 at 12. According to Samsung, the Court should not adopt the "plain meaning" portion of Neonode's construction because "glide" does not have a plain meaning to a POSITA and there is no intrinsic evidence that allows a POSITA to determine either the boundaries of that term, or whether a given user gesture is a "glide," a "drag" or a "flick." *Id.* at 13.

Neonode disagrees. According to Neonode, the intrinsic record provides a POSITA with ample guidance as to what "gliding" means. ECF No. 81 at 12. Neonode first contends that the claims use "gliding" according to its ordinary meaning: a smooth, continuous movement across or along a surface. *Id.* (citing various dictionary definitions). But Neonode contends that this does not include a "flicking" gesture, which is a sharp, quick movement. *Id.* at 13. Neonode also explains that "[a] POSITA would also understand that 'gliding' does not include a 'drag'/'drag-and-drop' gesture, which connotes a logical and (typically) visual dragging of a target across a display in order to drop it into a specific area." *Id.*

Neonode also contends that prosecution file provides further guidance. *Id.* At one point,

application claim 1 recited "moving in a direction from a starting point that is the representation [of a function] . . . to said display area . . . ." *Id.* To demonstrate the novelty of the invention, the applicant provided the Examiner with a link to Neonode's promotional video for a commercial embodiment, the Neonode N2 phone. *Id.* (citing ECF No. 81-14 (N2-Advertisement-Video)). The video showed a user activating functions by touching a thumb to locations that map to representations 21–23 and then smoothly moving the thumb from the icon upward along the display:



*Id.* (citing screenshots from ECF No. 81-14 at 00:26–00:27). According to Neonode, this movement of the user's thumb embodies the movement depicted in Figure 2. *Id.* No touched icon moves with the user's thumb, as would typically be the case in a drag-and-drop operation. And, as shown by the video, the movement is a smooth glide. *Id.* Neonode contends that this in no way resembles a "flick." *Id.*

After reviewing the video, Neonode explains that the examiner stated that he could "now see the difference between the prior art of record and the present application," but that the claims were "still too broad to suggest without research what was shown in the video demonstration." *Id.* at 14–15. In response, the applicant narrowed the claim from "moving" to a specific type of movement: "gliding . . . away from the location [of the representation of a function]." *See id.* at 15. The applicant explained that "[t]he subject claimed invention teaches 'rubbing', 'touch-and-glide' movements to operate a user interface, whereby the thumb touches a touch-sensitive screen

and rubs, or glides, along the screen without lifting the thumb," as illustrated in Figure 2. *See id.* Subsequently, the applicant again equated the "gliding" motion with swiping or rubbing, stating that the gesture is conducted "without lifting the finger" from the display. *See id.*

### b. The Court's Analysis

The Court finds that Samsung fails to sufficiently show that "gliding" is indefinite in view of the intrinsic record. The claims use "gliding" according to its ordinary meaning: a smooth, continuous movement across or along a surface. Although Neonode has distinguished "gliding" from "flicking," "dragging," and a drag and drop operation throughout the prosecution history and in its IPR, Neonode has sufficiently distinguished "gliding" from "dragging" to render it not indefinite. Importantly, both the examiner and the PTAB, although not expressly addressing indefiniteness, came to understand the differences between these movements. Therefore, the Court finds that "gliding" should receive its plain and ordinary meaning, not including "dragging," "flicking," or a drag and drop operation.

### V.    CONCLUSION

The Court adopts the constructions listed in the Claim Construction Order concurrent with this memorandum. Furthermore, the Parties should ensure that all testimony that relates to the terms addressed in this memorandum is constrained by the Court's reasoning. But in the presence of the jury, the Parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this memorandum that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED** this 14th day of July, 2023.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE